**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| TRENT D. MASSIE, | : | |
| Plaintiff, | : | Case No. 3:15cv00144 |
| vs. | : | District Judge Thomas M. Rose |
| NANCY A. BERRYHILL, | : | Magistrate Judge Sharon L. Ovington |
| Commissioner of the Social Security Administration, | : | |
| Defendant. | : | |

**REPORT AND RECOMMENDATIONS[1]**

I.      <u>**Introduction**</u>

Plaintiff Trent D. Massie brings this case challenging the Social Security Administration's denial of his applications for Disability Insurance Benefits and Supplemental Security Income.  He filed his applications on November 24, 2008, asserting that he had been under a disability starting on October 1, 1993.  He asserts here, as he did in his applications for benefits, that his health problems include (at a minimum) cerebral palsy, joint stiffness, allergies, myofascial pain, and hypothyroidism.  (Doc. #7, *PageID* #353).

On one previous occasion (in 2011), an Administrative Law Judge denied Plaintiff's applications for Child's Insurance Benefits and Supplemental Security Income based on the conclusion that he was not under a disability.  *Id*. at 137-46.  The Social Security

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Administration Appeals Council identified five problems with the administrative Law Judge's decision, vacated the decision, and the matter remanded for further consideration. *Id*. at 153-55. Upon remand, another Administrative Law Judge, Amelia G. Lombardo, took up Plaintiff's case. She held a hearing and later determined that Plaintiff was not under a disability and not eligible for benefits. *Id*. at 1310-22.

In the present case, Plaintiff challenges ALJ Lombardo's non-disability decision. The case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #16), Plaintiff's Reply (Doc. #17), the administrative record (Doc. #s 7, 14), and the record as a whole.

## II.  **Background**

### A.  **Plaintiff and His Testimony**

Plaintiff was twenty-three years old on the date his asserted disability began (October 1,1993). This placed in him in the category of a "younger individual" under Social Security regulations. *See* 20 C.F.R. § 404.1563(c). He has a high school education and has worked in the past work as grocery bagger, a crew member at a fast-food restaurant, a customer assistant at Wal-Mart, a dishwasher, and a "stocker" for various employers. (Doc. #7, *PageID* #254). Most of these jobs were part-time; all were hourly and paid at or near minimum wage. *See id*.

During a hearing held by Administrative Law Judge Lombardo in August 2013, Plaintiff testified that he could no longer work because of leg and back problems and repeated shoulder injuries. His back problems cause him "a lot of mobility issue as far as getting … around." *Id*. at 71. He noted, "I can't walk for a long period of time." *Id*. He can walk from his home to the library but he's "pretty warn out by the time [he] gets there …." *Id*. He

2

described the walk to and from the library as "pretty tiring." *Id*. His back and leg problems interfere with this ability to sleep; he only sleeps about four hours a night. Consequently, he is tired during the day and might occasionally take a nap. *Id*. at 90.

Plaintiff also testified, "I messed up my ankle a number of years back, I've messed up both my knees, so it's a—I say a lot of it goes back to my Cerebral [P]alsy, with having Cerebral [P]alsy… [A]s I've gotten older a lot of the issues I had back when I was younger bec[a]me more so …." *Id*. at 76.

Plaintiff estimated that he could stand for about thirty minutes at a time and has some problems with sitting. He explained that he hurt his tailbone when he fell and it causes him a lot of problems if he sits for a long period of time, meaning about an hour. *Id*. at 73.

Plaintiff has been treated for carpal tunnel syndrome and has "issues with writing and things like that…." *Id*. at 74. He is able to life about forty pounds at a time but could not do so all day. *Id*. at 74, 81. He's not sure if there is a different weight he could lift all day. *Id*. at 81. He also experiences headaches and takes prescription medication that takes the edge of his pain. *Id*. at 74, 77. He noted that his headache pain is always present. *Id*. at 74, 77. He has had headaches probably since he fell on ice and hit his head. On a pain scale from one to ten, he estimated his pain at level five. His headaches make it difficult for him to concentrate for a long period of time. He has issues with both concentrating and focusing.

Plaintiff has depression and anxiety. *Id*. at 76. He gets overanxious and impatient for things to happen. It takes him "awhile to learn … new things." *Id*. at 83.

Plaintiff's daily activities include doing his best to help his mother around the house. He tries to "help her with laundry and dishes and some cooking, things like that. *Id*. at 77-78.

He goes grocery shopping with her and tries to do some yard work.  He further explained, "I do what I can with, with laundry and things like that, to sort the laundry for her …."  *Id*. at 82. They used to go to the laundromat, but he had a hard time carrying the laundry basket.  He helps do some house cleaning, sweeping, mopping, vacuuming, "things like that."  *Id*. at 85. His mother does the main cooking.  She helped him manage his money when he was working, although he "really didn't make that much."  *Id*. at 87-88.  Plaintiff gets tired after about thirty minutes of doing things around the house.  *Id*. at 91.

Plaintiff watches TV during the day.  He has only one or two friends that he sees, the main friend being the mailman who he has known for years.  *Id*. at 78, 84.  His typical days start with getting out of bed, eating breakfast, and watching TV.  He is usually able to go to the library.  He continues:

> If I do whatever job, work I have to do like go out and mow the lawn or something I'll go out and mow … I usually break it up because I can't do it all at one time.  I mow the front lawn on one day, I mow the back lawn on the next day, do some trimming or whatever, things like that if I have to do some yard work.  In the wintertime usually I try to shovel the snow, which is not easy.

(Doc. #7, *PageID* #78).

Plaintiff indicated that he has trouble getting along with people, including some bosses.  He gets along with his mother most of the time.  He sees his brother about once a week.

**B.      Physical Health Medical**

Tamara Togliatti, M.D., primary care physician, has treated Plaintiff since at least 2007. (Doc. #7, *PageID* #990).  Plaintiff has seen Dr. Togliatti for treatment of cerebral palsy; myofascial pain syndrome; hypothyroidism; leg, back, and neck pain; limited range of motion;

a deviated septum; and allergic rhinitis.  *Id*. at  964, 970-971, 973, 976, 1049.  In May 2009,

Dr. Togliatti checked a box in a form indicating that Plaintiff Massie was a "medication-

dependent person." *Id*. at 1049.  She listed his medications as Synthroid, Flexeril, and Lopid.

The form defined "medication-dependent person [as] one who is undergoing treatment for a

chronic medical condition which requires the continuous prescription of … medication for a

long-term, indefinite period of time.  The loss of the listed medications would result in a

significant risk of medical emergency and loss of employability for at least 9 months." *Id*. at

1049.

Plaintiff underwent physical therapy but experienced minimal improvement and

continuing headaches .  *Id*. at 1009.  The physical therapist noted Plaintiff's pain level at 6 to 7

out of 10, and a diminished range of motion.   *Id.*  In addition to pain, his symptoms consisted

of limited range of motion, decreased flexibility, and headaches.  *Id*. at 1011.

Plaintiff was also seen in 2007 by Michael Helfferich, D.O.   Dr. Helfferich reported

that Plaintiff had unintentional weight gain, chest pain, shortness of breath, joint pain and

stiffness, headaches, and excessive fatigue.  *Id*. 998, 1001, 1004, 1007.

In April 2009, Dr. Togliatti completed a Basic Medical form for the Ohio Department of

Job and Family Services.  *Id*. 1047-1048.  She reported that Plaintiff's medical conditions

included chronic intermittent lower back pain, tender paraspinal muscles.  Dr. Togliatti

believed that Plaintiff was limited in his ability to engage in repetitive movement with his

wrist.  Dr. Togliatti also opined that Plaintiff was limited to carrying no more than ten pounds

and was moderately limited in his ability to bend or engage in repetitive foot movements.

Plaintiff's record was reviewed by Dr. Linda Hall for the state agency in February 2009 by Linda Hall, M.D.  *Id*. at 1045.  Dr. Hall stated that she had reviewed the evidence in the file at that time and agreed with the information from SSA form 5002 dated February 3, 2009.  The form that Dr. Hall referred to and relied on was completed by Mr. Christopher Eaton.  *Id*. at 387.  There is no evidence of record that Mr. Eaton is a medical health professional, who concluded that Plaintiff was "not severely impaired by a physical disorder."  *Id*.  Dr. Hall also relied on Plaintiff's functional report concerning his activities of daily living.  *Id*. at 1045.  Dr. Hall did not precisely read the functional report concerning Plaintiff's ability to walk.  She thought the Plaintiff reported he could walk "up to a mile" when he actually reported he could walk "less than" a mile, then needs to rest for five or ten minutes before he can resume walking.  *See id.* at 372, 1045.

In May 2009, state agency doctor, W. Jerry McCloud, MD affirmed Dr. Hall's conclusion that Plaintiff did not have a medically determinable severe physical impairment.  Other than a reference to "the 5/19/09 5002," Dr. McCloud did not provide any information or explanation in support of his opinion.  *Id*. at 1054.

In 2010 and 2011, Plaintiff saw neurologist Ling Xu, M.D. for problems including chronic headaches.  Dr. Xu indicated that Plaintiff was obese, suffered from bilateral hand and wrist pain, and cervicogenic tension headaches.  *Id*. at 1209.  Additional treatment notes from Dr. Xu reveal psychosomatic and psychosocial stressors related to worsening chronic daily tension headaches and tenderness of the temple and neck.  Id. at 1211-12.

Dr. Togliatti completed a Physical Capacity Evaluation in May 2013. *Id*

6

1205-1206. She explained that Plaintiff suffers from a "severe diffuse bilateral brain injury" that occurred at birth. *Id*. at 1206. She also explained that is of below average "cognitive, new learning and memory skills." *Id*. He has chronic headaches for which he sees an Ear, Nose, and Throat physician, and he has carpal tunnel syndrome. Dr. Togliatti opined that during an eight-hour workday Plaintiff could stand for three hours, walk for two hours, and sit for one hour. She also opined that could only occasionally lift eleven to twenty pounds in an eight-hour workday. He uses his hands for simple grasping and pushing and pulling but not for repetitive fine manipulation. He could not squat, and could not reach above shoulder level. Lastly, Dr. Togliatti thought that Plaintiff's condition would likely deteriorate if placed under the stress of full-time employment, and that he was likely to have partial or full-day unscheduled absences from work each month due to his diagnosed conditions. *Id*. at 1206.

### C. Mental Health Evidence

Psychologist Ty Payne, Ph.D. evaluated Plaintiff in November 2005 upon referral from the Bureau of Vocational Rehabilitation. Dr. Payne interviewed Plaintiff and administered multiple intelligence tests. *Id*. at 909-11. He listed Plaintiff's diagnoses as mixed personality disorder, cerebral palsy, respiratory problems, and back pain. *Id*. at 912. Dr. Payne explained, in part, that Plaintiff "is likely not to handle negative emotions well at all. He will likely have problems dealing with co-workers and supervisors…." *Id*. at 911.

In May 2007, Dr. Bernard Rose of Beavertown Clinic, Inc. completed a Mental Functional Capacity Assessment for the Ohio Job and Family Services. *Id*. at 907-08. Dr. Rose opined that Plaintiff was either moderately or markedly impaired in nearly every area of mental functioning. Most notably, Dr. Rose, for example, reported that Plaintiff had marked

limitations in understanding and remembering detailed instructions, maintaining attention and

concentration, sustaining an ordinary routine without supervision, making simple work-related

decisions, interacting with

others, and behaving appropriately. *Id*. at 907. The administrative record does not provide any

treatment notes or other findings from Dr. Rose, but he is listed at times as a requesting

physician. *Id*. at 920, 922, 925, 929, 1001, 1004, 1007.

In January of 2009, psychologist Stephen Halmi, Psy.D., examined Plaintiff at the

request of the state agency. *Id*. at 1017-26. Dr. Halmi diagnosed Plaintiff with dysthymic

disorder; personality disorder-NOS (not otherwise specified) with antisocial features; and

borderline intellectual functioning. *Id*. at 1023. He opined that Plaintiff had moderate

impairment in maintaining attention, concentration, perseverance, and

pace to perform simple, repetitive tasks due to borderline intellectual functioning. *Id.* at 1024.

Dr. Halmi also reported that Plaintiff had moderate difficulties in relating to

others and withstanding the stress and pressures associated with day-to-day work. *Id.*

In February 2009, psychologist Joan Williams, Ph.D. reviewed the record for the state

agency. *Id*. at 1027-30. She found that Plaintiff had moderate limitations in maintaining

attention and concentration for extended periods, completing a normal workday or week,

interacting appropriately with the general public, accepting instructions, and getting along with

co-workers. *Id*. at 1027-28. Dr. Williams concluded that Plaintiff "is able to perform simple,

repetitive tasks in an environment that entails no rapid changes, no strict production quotas,

superficial social interaction, and static job responsibilities." *Id*. at 1030. In May 2009,

psychologist Kevin Edwards, Ph.D. affirmed Dr. Williams' assessment without explanation or specificity.  *Id*. at 1053.

In February 2013, psychologist Linda Hartmann, Ph.D. evaluated Plaintiff at the request of his previous attorney.  *Id*. at 1112-23.  Dr. Hartmann had the opportunity to examine and observe Plaintiff on four occasions before she completed a Neuropsychological Evaluation.  Dr. Hartmann observed that Plaintiff's "interaction style was strongly reflective of a developmentally disabled individual.…"  *Id*. at 1113.  Dr. Hartman wrote:

> [Plaintiff] has a long history of difficulties with interpersonal interactions, and this behavior has created significant difficulty for him maintaining and sustaining work.  In addition, he has a slow processing speed and slow psychomotor speed that has also caused him to lose jobs due to performance issues.  He has difficulty maintaining attention and needs one-step verbal directions.  He is likely only able to carry out these instructions if it is repetitive and routine.  He cannot understand and remember detailed or complex instructions.  He is impulsive and makes poor judgments.  He has difficulty relating with coworkers or supervisors because he does not recognize appropriate social conventions, and can be viewed as inappropriate and offensive at times.  He is not able to deal with the public for the same reason.  He cannot deal with work stress, and any changes from routine would be an emotional trigger.  He is not able to function independently, and needs a supervised, job coach program.  He is not able to maintain attention and concentration, and has significant difficulty with persisting on a task, becoming easily overwhelmed by task demands.  Considering functional limitations he is moderately impaired in his activities of daily living; he is not able to drive, has difficulty with meal planning and budgeting, has limited understanding of basic household care (such as managing laundry appropriately).  He is markedly impaired in social functioning, and this is a lifelong presentation.  He has no friends and he has never had any friends.  He does not get along with supervisors and coworkers.  He is markedly impaired in maintaining concentration, persistence and pace.  He has no episodes of decompensation.  He has also not been able to live independently, and needs to have a supportive living arrangement due to his difficulties with independent functioning.

*Id*. at 1117.

## III.    **"Disability" Defined and the ALJ's Decision**

To be eligible for Supplement Security Income or Disability Insurance Benefits a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

To determine whether Plaintiff was under a benefits-qualifying disability, ALJ Lombardo applied the Social Security Administration's five-step sequential evaluation procedure.  *See* 20 C.F.R. § 404.1520(a)(4).  She found (step two) that Plaintiff has the severe impairments of "mild cerebral palsy, mood disorder, borderline intellectual functioning[,] and personality disorder."  (Doc. #14, *PageID* #1312).  She concluded (step three) that Plaintiff's impairments did not meet or equal the criteria in the Commissioner's Listings.[2]  ALJ Lombardo next assessed (step four) Plaintiff's residual functional capacity or the most he can do despite his limitations. 20 C.F.R. § 404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).  She concluded:

> [Plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels, including heavy/very heavy work.  Giving [Plaintiff] the full benefit of doubt with regard to his allegations and subjective complaints, it is found that he is limited to simple repetitive tasks.  He is further limited to low stress work, which in this case is defined as no assembly line production quotas, no fast pace, no contact with the general public, and only occasional contact with supervisors and co-workers.

---

[2] Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

*Id*. at 1315.  ALJ Lombardo also found (step four) that Plaintiff had no past relevant work.  *Id*. at 73.

ALJ Lombardo found (step five) that a significant number of jobs exist in the regional economy that Plaintiff could perform, for example, mail clerk, office helper, photocopy machine operator, and tube operator.  This led to ALJ Lombardo's ultimate conclusion that Plaintiff was not under a benefits-qualifying disability.

## IV.  <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …. "  *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The second line of judicial inquiry—reviewing for correctness the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence

11

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.      Discussion**

The ALJ placed "little, if any, weight" on Dr. Togliatti's medical opinion because  she concluded "it lacks objective support …." (Doc. #7, *PageID* #1317).  Doing so, the ALJ relied on her step-two determination that "the medical evidence does not support that [Plaintiff] is afflicted with any chronic physical ailment that more than minimally affects his ability to engage in work activity." *Id.*

Plaintiff contends that the ALJ erred by failing to evaluate Dr. Togliatti's opinions as the regulations require and by failing to provide good reasons to support her rejection of Dr. Togliatti's opinions.  The Commissioner maintains that the ALJ acknowledged Dr. Togliatti was a treating physician and correctly found that her opinions were not entitled to controlling or deferential weight due to the lack of any objective support.

Social Security regulations require ALJs to give the opinion of a treating source controlling weight under the treating physician rule, if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  "Even if [a] treating

physician's opinion is not given controlling weight, there remains a presumption, albeit a rebuttable one, that the opinion…is entitled to great deference." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (internal quotations and citations omitted). This rebuttable presumption requires ALJs to continue to weigh treating source opinions under certain factors: the length of the treatment relationship, frequency of examination, specialization of the treating source, supportability of the opinion, and consistency of the opinion with the record as a whole. 20 C.F.R. §§ 416.927(c)(1)-(6); *see Bowen*, 478 F.3d at 747.

The Regulations also require ALJs to provide "good reasons" for the weight they place upon a treating source's opinions by stating the specific reasons for the weight given to the source's opinions. *Wilson v. Comm'r of Soc. Sec*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting Soc. Sec. R. 96-2p, 1996 WL 374188 at *5 (1996)). The ALJ's reasons must be "supported by the evidence in the case record …." *Id*. The goals are to assist the claimant in understanding the disposition of his or her case and to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*.

The ALJ's cursory and conclusory evaluation of Dr. Togliatti's opinions failed to provide good reasons for the ALJ's decision to place minimal weight on this treating physician's opinions. The ALJ appears to have considered Dr. Togliatti's opinions only under the single factor of supportability. This constituted error because it provides no indication that the ALJ considered Dr. Togliatti's opinions as the regulations, Ruling, and case law required. *See* 20 C.F.R. § 404.1527(c)(2)-(6); *see also* Soc. Sec. R. 96-2p, 1996 WL 374188, *2-*4 (July 2, 1996); *Blakley*, 581 F.3d at 406. At best, the ALJ oversimplified the required evaluation by combining the applicable two-step inquiry. Combining the evaluation in this

13

manner permitted the ALJ to discard the rebuttable presumption applicable to treating physicians' opinions, *see Bowen*, 478 F.3d at 747, without any mention of, or meaningful consideration of, Dr. Togliatti's reasoning. *See* Doc. #7, *PageID* #s 1316-17. Meaningful consideration was needed because Dr. Togliatti was Plaintiff's long-term (since at least 2007) treating physician and because Dr. Togliatti explained that Plaintiff was severely limited due to "severe bilateral brain injury at birth…, low average, new learning and memory skills…, chronic headaches…, carpel tunnel syndrome …." (Doc. #7, *PageID* #1206). Dr. Togliatti has treated Plaintiff for numerous physical impairments such as myofascial pain; hypothyroidism; cerebral palsy; leg, back and neck pain; limited range of motion; a deviated septum; and allergic rhinitis. (Doc. #7, *PageID* #s 964, 970-971, 973, 976, 987-988, 1011, 1049).

Even if the ALJ had properly weighed Dr. Togliatti's opinions, the ALJ erred by crediting the opinion provided by the state agency physicians—*i.e.*, that Plaintiff did not have a severe physical impairment—without evaluating their opinion under any of the factors required by the regulations. ALJs must consider the regulatory factors when weighing the opinions provided by non-treating, consulting, and record-reviewing medical sources. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 836-37 (6th Cir. 2016). The consideration of these factors was especially warranted in the present case because their opinions were based on a review of the evidence in 2009 without the benefit of the medical evidence in the record some four years later when Dr. Togliatti provided her more detailed opinions. *See* Doc #7, *PageID* #s 1045, 1054, 1205-06; *see also Miller*, 811 F.3d at 834 ("[U]nder certain circumstances, an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or examining source. Such circumstances include where the non-examining source's opinion 'is

14

based on a review of a complete case record.'" (quoting Soc. Sec. Ruling 96-6p, 1996 WL 374180, *3 (July 2, 1996)).  In addition, both Dr. McCloud and Dr. Hall agreed with the summary and rationale by a state-agency employee (not a physician) embodied in the form dated February 3, 2009 but they did not explain why they agreed.  They merely based their agreement on their review of the evidence without providing any insights into what evidence convinced them that the state-agency employee was correct.  This substantially weakens their opinions particularly under the regulation's supportability factor, which promises, "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion …."  20 C.F.R. § 404.1527(c)(3).  And, more significantly, by applying the supportability factor to Dr. Togliatti's opinions but not to Drs. McCloud's and Hall's opinions, the ALJ improperly applied greater scrutiny to Plaintiff's treating physician's opinions.  "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."  *Gayheart*, 710 F.3d at 377.

It was also a dubious approach for the ALJ to find no severe physical impairments and no impairments that impact Plaintiff's residual functional capacity when the previous ALJ concluded, in 2010, that he could perform only a limited range of light work, meaning he could occasionally lift up to twenty pound and frequently lift up to 10 pounds.  *See* Doc. #7, *PageID* #141; *see also* 20 C.F.R. § 404.1567(b).  Although the previous ALJ's decision was vacated by the Appeals Council and was, therefore, not binding on ALJ Lombardo, it suggests unreasonableness in ALJ Lombardo's conclusion that Plaintiff could "perform a full range of

work at all exertional levels including heavy/very heavy work…" (Doc. #7, *PageID* #1315), meaning he could lift objects weighing over one hundred pounds and frequently lift objects weighing fifty pounds or more. *See* 20 C.F.R. § 404.1567(d)-(e).

Plaintiff turns next to the ALJ's decision to place little weight on examining psychologist Dr. Hartmann's opinions and to credit the opinions of Dr. Halmi. The Commissioner argues that the ALJ reasonably discounted Dr. Hartmann's opinions due to Plaintiff's dramatically different presentation during his examination with Dr. Halmi. The Commissioner points to many inconsistencies in the record that would undermine Dr. Hartmann's opinions.

The ALJ erred by crediting Dr. Halmi's opinion without weighing it under any of the factors required by the regulations, Ruling, or case law cited above. The ALJ makes no mention of any regulatory factor when crediting Dr. Halmi's opinions. *See* Doc. #7, *PageID* #1317. The ALJ compounded this problem by accepting Dr. Halmi's and Dr. Payne's opinions "to the extent that their opinions are consistent with the residual functional capacity." *Id*. This constituted error. Nothing in the regulation, 20 C.F.R. § 416.927(c), used for evaluating medical source opinions supports this analytical approach. Instead, it describes the opposite: "We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as ..., your residual functional capacity ..., the final decision for deciding such issue[ ] is reserved to the Commissioner." 20 C.F.R. § 416.1527(d)(2). Similarly, the Regulations elsewhere explain that the ALJ's assessment of residual functional capacity is based on "all of the relevant medical and other evidence...." 20

C.F.R. § 416.945(a)(3). The Commissioner's pertinent Rulings likewise describe the role medical source opinions and other medical evidence play in determining a claimant's residual functional capacity. Social Security Ruling 96-8p requires ALJs to assess residual functional capacity "based on all of the relevant evidence in the case records ...," including, in part, "medical source statements." Soc. Sec. R. 96-8p, 1996 WL 374184, *5 (July 2, 1996). The Ruling that explains to ALJs how to weigh treating sources' medical opinions neither instructs nor hints that the Residual Functional Capacity informs the analysis of treating-source opinions. *See* Soc. Sec. R. 96-2p, 1996 WL 374188 (July 2, 1996).  These Rulings together with the Regulations instruct ALJs to weigh medical-source opinions and then assess—in light of the assigned weight—the claimant's Residual Functional Capacity. ALJ Lombardo took the opposite and erroneous analytical path by first assessing Plaintiff's residual functional capacity, then accepting Dr. Halmi's opinion by comparing opinions to that assessment.

The ALJ found that Plaintiff's presentation during the evaluation by Dr. Hartmann differed dramatically from his presentation to Dr. Halmi.  For example, ALJ Lombardo and that Plaintiff was able to complete his own paperwork.  (Doc. #7, *PageID* #1317).  Without more, the fact that Plaintiff completed his own paperwork is insignificant.  There is no description of the paperwork Plaintiff completed.  It could have been very extensive or very limited.  It could have required him to provide many pages of detailed information. But it might have only required basic information, such as name, address, symptoms.  It could have simplified the process of completing the paperwork by utilizing boxes for check marks or by asking straightforward yes/no/maybe questions.  It was not reasonable for the ALJ to place any significance on the fact that Plaintiff completed paperwork for Dr. Halmi.

ALJ Lombardo also noted that Dr. Halmi described Plaintiff's gait as "unremarkable" and his speech as "articulate." *Id*. at 1317. She then observed that Dr. Hartmann reported a slow gait and mild articulation difficulties. She described these differences as "describing two different people." *Id*. These minor differences are not reasonably characterized as describing two different people. While these minor differences appear in the record, they are not significantly probative of whether Dr. Hartmann's observations about Plaintiff's credibility were valid or the weight due Dr. Hartmann's opinions about Plaintiff's mental work limitations. This is especially so in light of the many tests Dr. Hartmann administered over the course of four different meetings with Plaintiff, the test results she described, her detailed analysis of those test results, and her specific and thorough discussion of Plaintiff's mental work limitations. *See id*. at 1113-17.

Moreover, the ALJ ignored or overlooked the fact that Dr. Payne's opinions tend to support Dr. Hartmann's opinions. Dr. Payne opined that Plaintiff would have difficulty handling negative emotions; would likely have problems with co-workers and supervisors; would do best in work minimizing his contact with the general public; and would need direct, clear, and repetitive supervision. *Id*. at 893. Dr. Rose's opinions were likewise consistent, in some respects, with Dr. Hartmann's. Dr. Rose opined that Plaintiff suffered from mostly moderate and marked limitations in all areas of functioning. For example, he found marked limitations in Plaintiff's ability to maintain attention and concentrate, sustain an ordinary work routine without supervision, get along with others, and maintain socially appropriate behavior. (Doc. #7, *PageID* #907).

18

Lastly, ALJ Lombardo considered Plaintiff's obesity and concluded that he "has no 'severe' impairment that might be exaggerated by his obesity." *Id*. at 1215. This, however, was insufficient.  ALJ Lombardo reached this conclusion at step 4 of her evaluation.  She improperly omitted consideration of Plaintiff's obesity at step 2 of her evaluation and thus failed to comply with the Social Security Ruling about obesity.  This Ruling, 02-01p, mandated the ALJ to "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."  2002 WL 34686281, at *4 (Sept. 12, 2002).  The ALJ's decision, moreover, implies that the ALJ thought obesity by itself cannot constitute a severe impairment and need not be considered by itself at steps two and four.  Yet, Ruling 02-01p reveals that obesity alone can be a severe impairment at step two. The ALJ was also required to consider Plaintiff's severe and non-severe impairments at step four when assessing Plaintiff's residual functional capacity.  *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments…, including your medically determinable impairments that are not 'severe'…, when we assess your residual functional capacity.").  It was error for the ALJ not to consider the impact Plaintiff's obesity alone had on his work abilities at step four.  This conclusion aligns with the Appeals Council's instructions to the ALJ, on remand, to "[c]onsider the claimant's obesity and provide an assessment of its effect on [his] ability to perform routine movement and necessary physical activity within the work environment …."  (Doc. #7, *PageID* #155).

Accordingly, for all the above reasons, Plaintiff's  Statement of Errors is well taken.

## VI.  **Remand Is Warranted**

Remand is warranted when the ALJ's decision is unsupported by substantial evidence or

when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand for an ALJ's failure to follow the regulations might arise, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff's credibility lacking, *Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994) (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

A remand for an award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of disability is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order remanding this matter to the Social Security Administration pursuant to sentence four of

§ 405(g) due to problems set forth above.  On remand the ALJ should be directed to review the evidence of record and determine anew whether Plaintiff was under a benefits-qualifying disability pursuant to the applicable five-step sequential evaluation procedure.  The ALJ should be specifically instructed that his or her five-step evaluation must, without limitation, re-assessment of Dr. Hartmann's opinions, and re-assess Plaintiff's residual functional capacity, including consideration of the impact Plaintiff's obesity alone, and in combination with other impairments, has on his work abilities.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Trent D. Massie was under a "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Commissioner and the Administrative Law Judge under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.    The case be terminated on the docket of this Court.


February 15, 2017                                      *s/Sharon L.  Ovington*
                                                       Sharon L. Ovington
                                                       United States Magistrate Judge

21

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).